Let's talk about railroads. Mr. Mahaney, did I say that right? You did. We'll be glad to hear from you. Thank you, Your Honor. Good morning. May it please the court, my name is J.H. Mahaney. Along with me today is Nancy Winkleman, Matt Lockhart from my office. We're here on behalf of Norfolk Southern Railway Company. The district court below made two primary errors in granting the plaintiff's motion for summary judgment on the liability issue. Each of which independently justifies a reversal of that order. First, the district court took a statute that, or a regulation from the FRA that governs inspections and read that statute extremely broadly to contain an implied obligation on the part of the railroad to keep its tracks clear, completely clear of anything that could impair an inspector's view of the track. In other words, that the duty to inspect implied an affirmative obligation to keep the track completely clear of any material, ballast, snow, anything that could impair the inspector's sight of the track. We think given the extraordinary specificity of the track safety standards, the technical expertise that the FRA brought, if the FRA wanted that standard to be in the regulation, it would have put it there. There's no indication it was meant to be there, and it was error for the district court to include it. Second and separate, that even assuming that there was an obligation to clear the track, and even assuming that constructive knowledge was the appropriate liability standard for the court to evaluate, the district court applied that standard in a wrong manner. The formulation that the FRA has instructed is very clear, that you can infer from the existence of the defect, and if the inspection exercised in accordance with the standards, exercising reasonable care, would have shown its existence, then you could find liability. The district court skipped the important step of asking the question, if the track had been clear, the inspections conducted in the correct manner, would this have been found? It didn't even ask that question. More of a strict liability standard, the evidence would have shown either that it wouldn't have been found, or at the very least, that it was a jury issue. Turning first to the issue of the track inspections, the district court had to get into this issue altogether because it had to find, to allow the case to go to the jury, or deal with the issue, a violation of the statute. This is not a common law claim. Under West Virginia law, these regulations were issued under the track safety standards from the FRA. They come from the Federal Railroad Safety Act of 1971, intended to broadly regulate railroad safety, promote national uniformity, but importantly contained a very, very broad preemption provision. That state law, whether by judicial enactment, legislative enactment, is preempted. In the Lundin case in 2007, the Eighth Circuit recognized even where the railroad violated track safety regulations, there was still no remedy. Congress opened a very small crack when it amended 20106B in 2007 and said, if you can prove an actual violation of an FRA regulation, then you may bring a claim. So the critical issue here for the district court was, did the railroad, did we violate Section 233 on visual inspections by not clearing this material from the track, the coal that was underneath the coal tipple that was there? The FRA's regulation of this area is very, very comprehensive. It sets out how, when, by whom, very specific details about the types of inspections that have to be conducted. It made a policy choice. If you look at the entirety of the structure about how you can catch these types of regulations or defects. For example, rail defects, there's plenty of technology where you can find them before they even become visible to the naked eye. 213.237, the FRA says, for certain classes of track, like this class of track, class one or two, doesn't matter here, railroads have no obligation to do that. Only find things that can be visibly found. So the FRA brings this wealth of expertise to these track regulations. It makes policy choices that are designed to be able to allocate resources to the areas where they will do the most good, with the types of class of track where they will do the most good. Realizing that railroads aren't going to find everything, every defect through these inspections. In fact, in the preamble to the 98 amendments, the FRA specifically said, look, we realize that even with the exercise of reasonable care, under the regulatory structure that we have enacted, many, and that's their word, many defects will not be found, even with the exercise of reasonable care. So the question in this case was, under 233, when it says visually inspect the track structure, did that mean inspect every single piece of it? You have to look underneath the head or the ball area of the track. Or be able to see every piece of it. Tracks are ties, they're rails. Would it have required the inspector to look beneath the head of the rail? Only if in the course of an inspection something would have alerted them of the need to do so. Again, under 233, the visual inspections can be done riding in a car or a walking inspection. The vast majority of them are done in a truck riding over the track itself. Could you explain to us what this high rail inspection consists of? Yes. I mean, is there a clear panel? I've been trying to visualize this. How do they actually look at the track if they're riding in something? Just a truck. And they have a set of wheels that drive down the track, that put it on the rail itself, and they drive down the center of the track. Does the driver of the truck look at it? The driver of the truck is the person who is looking at the track itself. There's no one else in the truck? There can be. I mean, if you look at 233, it contemplates that two people can inspect up to four tracks at once. One person can actually do two tracks at once. But it's not technical. It's literally just like you're driving down the street to your house at a speed that lets you kind of look around and see everything around you. You can see a lot of things, but you can't see everything or every crack in the pavement when you're doing that. And that's basically what the FRA said. We believe that— You said you only had to—you may be required to look underneath the head only if you see some sort of problem, like to use your analogy, a crack in the pavement. Right. But if the pavement or the railway is covered with coal dust or dirt or snow, you could never even see the issue in the first place. Well, but you could see the symptoms of the issue. For example, if it's covered with snow and you have a crack in the street, you can see the unevenness in the pavement. And that's what we presented to the district court, was that it's not meant for the FRA—never meant to see every single piece, every tie, every piece of every—it couldn't have. Otherwise, it would have never said that many defects are never going to be found. What it was talking about was look at the structure and see if there are these symptoms of the problem. And we presented evidence that said, you know, if you have a tie that's breaking, the rail's going to move a little bit, there'll be a gauge issue. In fact, in the technical compliance manual that the FRA issued for guidance in the field with respect to Section 103, which deals with ballast, it specifically says, look, we're not going to—you shouldn't have a problem with improper ballast conditions in and of themselves. You should look to see if there's a problem being created like a gauge issue, the tracks are too wide. And that's what it's all based on, looking for symptoms, and you see what can be seen basically from the presentation itself. But the regs themselves say that the track inspector's visibility has to remain unobstructed, doesn't it? It does in that section, Your Honor. Unobstructed by any cause? It does. So what does that mean? Does that mean the stuff can be piled up and covering everything? It does, actually. And the history of that's actually very important. That section didn't exist until 1998, the section to which you're referring. And it was added to a section that dealt specifically with multiple tracks. And what it deals with is that one inspector can inspect two tracks so long as their view is unobstructed by any cause. And we have both the FRA's Federal Register comments and the Technical Compliance Manual that say that means rolling stock, a tunnel, or uneven ground. It doesn't say every single piece. It basically means you can't see the other track because of or unobstructed by any cause. It was never intended to mean, with respect to any specific track, every piece of every track. Ultimately, if you go through and you look at a statutory or regulatory analysis of this and you ask the question, is there any clear expressed intent from the FRA that the district court's interpretation was correct? You look anywhere. Federal Register. You look at its compliance manual, its enforcement history. It's been on this very line and didn't issue any citations. There's really nothing out there that says that this was the result that it intended. And given the broad scope of it and the impact on the railroad industry, this court should not lightly infer that. In dealing with agency regulations, there's a deference principle that the courts need to give it. Unless it's very clear in the regulation of the history, which it's not, the court should defer to the agency's decision because oftentimes, and here if you look at the legislative history or the regulatory history, the agency will often not adopt the standard because of issues like practical implementation issues. So there's really nothing in the record here that would indicate that that was a proper standard. The standard should have been see what can be seen using the reasonable care that is required under the regulation, whether the material is there or not. And, Mr. Mahaney, there's some dispute in this record as to what could have been seen, what would have been seen, but here we've got a nine-foot break in the track that was corroded in half. Dr. Pond says this is the worst one I've ever seen out of thousands. Was there any testimony by the experts that talked about a track that was in that situation after the accident, what it would have looked like before, not would have seen, could have seen, but what the track physically would have manifested? Well, you have to ask that. Yes, there was. You have to ask the question from the perspective of what it would have looked like doing a required inspection, not if you got down and got out and looked underneath of it, because that's what the plaintiffs in their own summary judgment brief said in their footnote. The only way that you're ever going to see that is if you get down and physically look underneath of it. All right. So no, my question is, could you point us to where in the record any expert opines as to what the track would have looked like, a track that, and I don't know whether they could testify to this. I'm just asking you, given the type of break, the significant break that, you know, the way Pond described it, the way the other people described it, this was a pretty significant break. Does anybody talk about what it would have looked like conducting the high rail inspection? If you look specifically at Dr. Bagnall, not his report, because reports aren't admissible on summary judgment, but as his deposition testimony, which would be at the appendix at 3800 and 3799, we specifically asked him that question and said, when you say you could see it from a visual inspection with this material, what do you mean by that? He said, well, if I'm walking, I could dig it out and I could look up underneath of it and I could see it. That's not my question, though. From the top. If I'm going across the top, would you expect to see any evidence, would you not expect to see any type of signs on the top or the ball or the head of the rail itself? Correct, you wouldn't. His answer was no. He went on to say, I would not expect to see any damage on the top, and in fact the pictures that I have looked at in this case don't show any damage on the top. And that's at 3800 in the record. And that's really the critical... So you wouldn't have seen anything, even their expert wouldn't have seen, expected to have seen anything, even if the inspection had been conducted the way they say it should have been conducted. The best, the closest that anyone came in the record, and Mr. Carney talked about that at 1969, and Mr. Blackwell in the inadmissible report said that oftentimes you might see, or sometimes you might see some bleeding from basically the rust discoloration from the crack itself that comes down towards the bottom of the rail. The problem with that testimony was no one, not a single expert, analyzed that from the perspective of a truck, a driver of a truck, as to whether that really could be seen or not. Because that's the issue. Not a West Virginia law claim to say, well, as the danger goes up and the risk increases, you really have more of a duty to exercise some care to find this. To the contrary, the question had to be limited to under 233, conducting the inspections in that fashion, would an inspector have found it doing what was required of them and no more? So whether or not it would be bleeding or not is one part of the question, but just much like the district court erred in not asking the next question, does it make any difference? In other words, can a truck, a driver in a high rail vehicle, see this defect when you're doing what's required and not maybe permissible? Now, when Bagnell said it could have been detected by an ultrasonic inspection. Correct. Didn't he say that at 3805? Excuse me? I think maybe around 3805 he said that. No question, and we agree it could have been found ultrasonically, but that is not something that's required for this class of track. If you want to look at 213.237. He also says it could have been inspected by a visual inspection. He said ultrasonic or visual there. Right, and the portion that I incited to you, 37993800, was where I specifically said, tell me about visual. And he says, I get out and I walk, and if I look underneath the bottom of the rail, that's what I'll see, but nothing on the top. Right, but then later on, about five pages later, he said it could have been detected by visual or ultrasonic, didn't he? I think visual. He did talk about that back and forth. So is the evidence in dispute is what I'm getting at. I understand your argument on causation. It is clearly in dispute. We believe it was not in dispute because it didn't address the critical issue. The plaintiffs didn't come forward with the evidence in the manner and in the way that they needed to do to frame the issue. However, the worst-case scenario was that this evidence was in dispute. I guess that's really what my question is getting at. Why isn't this testimony at least putting the matter in dispute for purposes of a trial? We think it is, and we think that had the court asked the correct question, may I finish my response, Your Honor? Had the court asked the correct question under the constructive knowledge standard and said does the evidence support a new or should have known and otherwise in the exercise of reasonable care could this have been found, this was something that the judge never should have taken away from the jury. At the very least, if he doesn't resolve it in our favor for not framing the issue correctly, we were entitled to a jury trial to have that issue resolved as issues of due care are almost always submitted to the jury. Thank you. Mr. Stanley? Thank you, Your Honors. Bruce Stanley on behalf of Mr. Harris. I think the first thing that the court needs to understand is why, if there was a dispute about this issue, would an experienced jurist like Judge Goodwin have given summary judgment? And on the very issue that the court has focused right now, the answer to that is very straightforward. Under joint appendix at 4720, Judge Goodwin asked of the Railroad's counsel, so it is your position that in carrying out prudently and completely the regulations requirement for a visual inspection, one could never be expected to catch that defect? And the answer was, I don't take that position. And so, as far as Judge Goodwin was led to believe by Railroad counsel, the issue that is now the crux of the Railroad's appeal was not an issue at the time the judge was given consideration to the motions for summary judgment. It's important, I think, for Your Honors to also appreciate just quickly the circumstances of what we're talking about here. And this goes directly to the issue of what could or could not have been seen, and I will point you to what we believe is dispositive evidence in the record from their witnesses on the ability to have identified this error or this defect. And to call it a defect is a misnomer, actually. It was a neglected rail that was allowed to rot in the ground in place. This is the coal load-out facility that's at issue. It's down in southwest Virginia, and this is a close-up of it. And this is the coal facility itself. And what happens is when you do the shoves, as I'm sure you're aware, they back that train up past the load-out and then pull it back down when the coal drops down and fills the cars as it pulls out slowly. And it was in the effort to back that train up past that tipple that the rail gave way and the train derailed. And you can see right there, that is the condition of the rail. And you can see at that point the level of corrosion that we're talking about. But in context, this is the condition of the track in the immediate vicinity of the tipple. The regulation, as Mr. Mahaney pointed out, says that the— Can you go back to the photograph before and tell me again what I'm supposed to be seeing there? Yes, your Honor. This is what was left of the track. This is the piece of track that the track broke. And you can see, even at that angle, the level of corrosion. That's after it broke. Yeah, that's correct. After it had suffered. Now, when you say after it broke, that's important. What actually broke was only the remaining piece of the ball that was connected on the rail, all the evidence, including of their two rail experts. Mr. Bagnall, by the way, is a metallurgist, but he's not a track or a rail expert. Their track experts acknowledge that this condition had been developing for years. And it's the heavy discoloration and the rust that in a track where you could see the structure. And it's important to recollect what the track structure constitutes. The track structure is the rail, the tie, the ballast, and the connecting pieces between the ties and the rail. You can't conduct a visual inspection of what you can't see. Now, you can't. And the regulation anticipates that the rail... Does it require it? It does not. But what it does do is it allows the railroad to supplement its visual inspection requirement with that ultrasonic testing. That's what they did here. They thought that they had ultrasonic testing taking place when they did not. And their third-party practice is very revealing in this effort. Immediately after the suit was filed, they filed a third-party claim for both express indemnity and implied indemnity and contribution against Sperry Rail Services, alleging that, hey, this would have never... You couldn't have been doing a proper ultrasonic inspection, which we supplemented because, obviously, they're not getting good visual inspection, and not have detected this. You did something wrong. And they ended up settling that case, dismissing that case against Sperry. But according to the regulation, they didn't do anything wrong because I think you said they weren't required to do the ultrasonic testing. This is on the basis of the contract agreement between them. They weren't required to do the... The railroad is not required. It's a supplement. Now, what they are required, though, is to do a visual inspection of the entire structure, which you cannot do. It's common sense if you can't see that structure. Now, we're not... The coal buildup you're talking about. Yes, and it's... They're not required to look underneath the ball of... No, actually, the coal structure... The visual inspection requires that they inspect the entire track structure. That'd be done by riding down the rail. According to them, a trained inspector can. And according to them, as Mr. Mahaney admitted, a trained inspector ought to be able to see the discoloration. If that rail, the full rail, is exposed sitting on the tie and we have the level of corrosion that's been testified here that is the worst that the railroad's own outside expert and its own internal expert has seen in their long careers, the way that a good trained track inspector spots that is he's looking at that rail going down and that rail should be uniform in color. And then when he gets and he starts seeing that rust and corrosion, he knows he's got a problem. Well, why did your expert say that he would not expect to see damage on top of the rail? Because the top of the rail, the very surface of the rail, would be rubbed smooth by virtue of the train traffic over it. So what you look for is when that... And a head-web separation is not like some freak occurrence. I mean, these are relatively regular rail issues that are experienced by the railroad. What's unique about this one is the massive size of it. We're talking a nine-foot-long corroded-through break in this rail, not a single defect that can't be seen by any surface exposure and can only be found by ultrasonic testing. Well, going back to Judge Keenan's question, why shouldn't all of this go to the jury? Because, as I've indicated, when this very question was raised with Judge Goodwin, are you contending that an inspector would not be able to identify this defect? I don't take that position. It's only now, after the fact, that they want to revisit that issue. I don't see how they get to do gotcha with the judge to tell the judge that I don't have that issue, that's not an issue in the case, and then turn around and say, you know, now, after the fact, when he's based his ruling based on an affirmative position they've taken in the court below, to say, oh, well, no, that's not what we really meant. You've lost me. I apologize, Your Honor. It's more my fault than yours. I just don't understand the significance. I don't attribute to that statement, that answer, the significance you do. So can you explain to me why you think that, again? Yes, Your Honor. I mean, because the question was put before the judge. Are you saying that even if you had done the visual inspection that was required by the regulation, that visual inspection would not have revealed this defect? In other words, would a visual inspection have turned it up? No, we're not taking that position. Therefore, what? Therefore, you know, what is clear from the evidence that was in front of the judge is that that defect would have been readily apparent. And I can read to the court from their own experts. It's fairly clear, if I may, Your Honor, from their expert, Tim Ward. Basically, it was pretty obvious that the broken rail was what caused the derailment. The fracture faces were very corroded. The rail itself was very corroded. The rail was submerged in coal dust mixed with dirt, ballast, and all the things that was there. But basically, it was up to the level of the top of the rail and packed in there, and corrosion was severe, and it was decided by the parties present that I would take possession, basically, of the 9-foot piece of rail that broke. Their outside, according, this is from Mr. Tim Ward, their internal expert, and talking about their outside expert, he was kind of geared toward figuring out the mechanism that would cause such accelerated extreme corrosion on the rail. It was accelerated in stream because you just do not normally see a rail that's corroded that much, and it was clear that the corrosion was part of the failure mechanism that had taken place. This is not your normal situation. This is a situation where that rail was rotted in two, and they say it was rotted in two because it was packed in this. But because it was packed in this, their visual inspection would not let them see that it was rotted in two. Thank you. All right, Mr. Mahaney. Thank you very much. The record was very clear below that we took to position that with the exercise of reasonable care, this was not the type of effect that could be found. And, Your Honor, if you take a close look at exactly what I said, maybe it was a little bit more verbose than I should be, but I said basically the exact same thing that I told Your Honors a little while ago. I said I don't take the position that that's exactly true. I said there actually is a better way to find this defect that's not so crude as a visual inspection, and talked about 237, ultrasonic testing. And I said the problem was that the FRA made the policy decision that we don't have to do that. So you basically have a risk analysis or a risk acceptance that the FRA has decided to accept. There will be a period of time from which this metal defect begins, and it's at the microscopic point all the way to the point that it becomes a visual metal failure, which is a long way. If this was a West Virginia tort case, you would say we should never let it get that far. But the FRA has made that policy decision, so only when we should find it visually through the exercise of reasonable care do we have any duty to find it. There really wasn't any evidence in the record as to when that point was, so you can't say, well, it was a long time or it was really bad or anything along those lines, because it doesn't address the critical question of could it have been found through compliant inspections. If you want to just look at 4722, I guess I talked for about a page and a half, but I specifically said, so this is basically a situation where the type of inspection isn't the type of inspection that's going to turn this up. That's an FRA policy decision that's been made. And that's exactly what we have in front of us here, is that certainly under a West Virginia common law claim there were ways that this could have been found. You could make the argument that it should have been found before this point, but given the presentation of this defect up underneath the ball of the rail, its location and the manner in which it was presented, the plaintiffs are in fact the ones that conceded in their opening summary judgment brief the only way to manually inspect, and if you look at the way that that was juxtaposed to what they were saying was, manually versus ultrasonically inspect, was to look up underneath the ball of the rail. Could you clarify for us, though, Mr. Mahaney, Mr. Stanley saying that you replied, that's not our position when the court asked you, or you saying if you'd done the required visual inspection, this would not have been turned up. Could you address that specific part of the record? Because I think, at least from what I'm gathering, there's a little bit of parallel conversation here between the two of you. Well, what the judge asked me was, could you have found it? And I said that it would never have been able to be found. And what I said was, I don't take that position. You could find it through ultrasonic inspection, and I talk specifically about 213.237. I talk about why that is significant in rail, because rail defects have to progress to a certain point before you're ever visually going to find them. Then the nature of visual inspections that are made, that they were trying to basically say, you have to get out and walk. Because remember from the record, we had the dispute whether we had to exceed. The plaintiffs took the position we really needed to exceed the regulations. Or our own internal policies were dealing with whether we needed to exceed those or not. And I'm bringing it back around to say, we don't have to get out and walk. The inspector can stay in his truck at a speed that he chooses within his discretion and see what can be seen. And I finish and say that, specifically, that these types of inspections are the types of inspections on page 47.22 that is not going to turn this type of inspection up. So you come back around in terms of the issues or the state of the rail and those kind of, I don't think that really addresses the issue. And certainly on the issue of punitive damages, I would say that when we get to that issue that the court needs to remember, much as I think Judge Goodwin did, that the correct analysis that he went through is that we still have to look at it in terms of what is a statutory violation or what is a regulatory violation. And only those things that are regulatory violations are going to be actionable. To say that it had been there a long time, we don't have the duty to discover it until it's visibly seeable through these types of inspections. If the court rules that the material is not a violation of the regulation, which we believe it should, given the regulatory history, then there's no evidence in the record or in suggestion that we should have found it. But the worst-case scenario is that if we apply a new or should-have-known standard, that there certainly is not a gap in the evidence that would have allowed judgment against us. At the worst case, that was a jury question on liability, but it did not give rise to a claim for punitive action. Let me ask you a hypothetical. Let's suppose that we believe, and this is just a hypothetical, suppose we believe that liability should not have been determined by the court and that we send it back, for which there will be a jury trial on liability. But we think that the trial that it was held was without irreversible error. Would the trial then be just on liability? I see my time's up on my answer, Your Honor. Sure. Well, I preface by saying that we do have an issue in the case about the cancer, and if it goes back, we shouldn't have to deal with it. No, you do not listen to me. Now you're changing my hypothetical. I understand. Just answer that question. The case could be sent back, theoretically, only on the issue of liability. However, if you look at West Virginia law and this Court's law in terms of how trials are to be structured, that unitary trials are favored in terms of those issues coming together. Theoretically... Perfect trials are favored, too. Exactly, correct. You don't always get them. But I don't disagree that the issue could be sent back solely on the issue of liability. Okay, thank you. Mr. Stanley? Yes, Your Honor. Again, I don't know how you can conduct a visual inspection of that. You cannot see. Mr. Stanley, though, would you make sure to address this last point, too? Oh, absolutely, I will. Yeah, I'll start with that point. Obviously, there was a full trial on the issue of damages, and damages were reasonably decided by this jury,  and the issue of damages is clearly able to be separated and apart from the issue of liability. I don't think there's any question about that. The only damages issue, of course, that we take exception to is the notion that there should have been an instruction and the jury should have been allowed to consider punitive damages. And I defer to the West Virginia statutes on the substantive law of West Virginia on when punitive damages applies applies here. I don't think there's any debate about that. The only issue that I would take exception to is Mr. Mahaney's notion that there was no knowledge or information available to the railroad with regard to the nature of this conduct. That's simply not true. The conductor who operated on this train gave extensive testimony about the sad state of the rail and the track in this area, and essentially that it was only a matter of time before something terrible happened. There's also their own gentleman's, Mr. McCracken's, notion of once we get the track back in service, it will once again be buried in coal and it will be years before any other timbering work is done. The track has been buried in coal for years and the metal could very well be corroded to little or nothing. So the notion that, oh, we couldn't see it, well, of course you wouldn't see it because you couldn't see it. There's no way you could conduct the visual inspection for a period of years while this highly corroded rail rotted in the ground. There's testimony that this area of the track was periodically cleared. I'm not aware of that, Your Honor. The information I'm aware of is that when it was cleared, what they're talking about was they were taking coal off the top of the track itself. They would clear it off. The railroad would require the coal company at times to clear the excess coal off the top of the rail, but nothing down in the track in between the rail. That developed for years. Their own expert, Mr. Pond, theorized that what was actually going on here was the wetted coal in place so long up against the side of that rail actually created a sulfuric acid effect that ate into the rail and ate it in two. And again, we're not talking about some minute fracture here. We're talking about a nine-foot long piece of rotten rail that had it not been, one, had it not been embedded in that coal, wouldn't have rotted. And two, had it not been embedded in that coal and was rotting, you would have been able to see it. There is no way you can conduct the regulatory required visual inspection of that which you have not been able to see for years and years. I've got work being done on my house. The contractor came the other day and he took a piece of my exterior siding and said, look at this. And it was rotted. When he turned it over, it was rotted. But just looking at it from outside and looking at my house, I thought everything was fine. Yeah, and unfortunately, Your Honor, that's not the situation here. One, you've got to remember, your house wasn't cut. He didn't have to dig away the dirt to get to it and say, well, even when I dig away the dirt, the siding appears intact. But when I take it off... Actually, he did. Well, my point, Your Honor, they are required to do those visual inspections. They could not see what was evident to their own people, that it had been rotting in the ground in place for years. It would not have rotted had it not been covered in dirt. And had it not been covered in dirt, they would have been able to see the condition of that track. They certainly would have been able to see that bleeding and discoloration. And that's from their own track experts. That's from their own folks. Okay? Thank you, Your Honor. Anything else from the panel that we may be of assistance on? No, thank you. Thank you, Your Honor. We'll come down in Greek Council and take a break, about 5 or 10 minutes.
judges: William B. Traxler, Jr., Barbara Milano Keenan, Stephanie D. Thacker